**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1638**

———————

CURTIS LEVAR WELLS, JR.,

        Plaintiff – Appellant,

v.

JAVIER FUENTES, Badge #1666; SCOTT WANEK, Badge #1137; MICHAEL P. ARMSTRONG, Badge #331; LAUREN LUGASI, Badge #1625; KIMBERLY SOULES, Badge #1630; AUSTIN KLINE, Badge #1720; JOHN VANAK, Badge #1399; KEITH SHEPHERD; JOHN DOES 1 through 10; UNITED STATES OF AMERICA,

         Defendants – Appellees,

and

ASHLEY BARNICKLE, Badge #1574; COUNTY OF ARLINGTON,

        Defendants.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:22-cv-00140-MSN-IDD)

———————

Argued:  September 26, 2024                        Decided:  January 22, 2025

———————

Before THACKER, RICHARDSON, and BENJAMIN, Circuit Judges.

———————

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Thacker and Judge Benjamin joined.

———————

**ARGUED:** Matthew Aulin Crist, MATTHEW A. CRIST PLLC, Manassas, Virginia, for Appellant. Yuri S. Fuchs, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Blaire Hawkins O'Brien, HARMAN CLAYTOR CORRIGAN WELLMAN, Richmond, Virginia, for Appellees. **ON BRIEF:** Robert E. Barnes, BARNES LAW LLP, Los Angeles, California, for Appellant. Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Federal Appellees. David P. Corrigan, Leslie A. Winneberger, HARMAN CLAYTOR CORRIGAN WELLMAN, Richmond, Virginia, for Appellees Javier Fuentes, Scott Wanek, Lauren Lugasi, Kimberly Soules, Austin Kline, and John Vanak.

───────────

RICHARDSON, Circuit Judge:

Curtis Wells parked somewhere he shouldn't have. He stopped beside a road running between Arlington Cemetery and the Pentagon, then gestured wildly while he took a phone call. Police understandably checked on him. When they did, they realized Wells had neither license nor registration and wrote him a ticket. Without a registration, Wells couldn't stay parked on the roadside. And without a license, he couldn't drive home either. So the police had to tow his car.

Wells's parking ticket became a criminal case when officers found an assortment of weapons and tactical gear in his car. Along with guns, face masks, and a grenade, officers spotted a body armor plate carrier in the back seat. The police sent Wells home that day and kept some of his gear for safekeeping. But further investigation suggested that the plate may have been stolen from the Army. So, nine days later, police arrested Wells for receiving stolen property.

Wells now challenges the officers' actions. But the Fourth Amendment proscribes only unreasonable police actions. And when officers enjoy qualified immunity, their actions must not only be unreasonable, but patently so. Because everything Wells describes passes that test, and because his other claims fall short, we affirm the dismissal of all his claims.

I.     Background

A.     Officer Armstrong Approaches Wells by Arlington Cemetery

Curtis Wells parked his Mustang outside Arlington Cemetery in February 2020.[1] There, he took a phone call and drank a strawberry-banana smoothie. Michael Armstrong—a police officer assigned to the cemetery—noticed Wells's gestures while he was on the phone.[2] From Armstrong's point of view, Wells was making "animated," "flamboyant motion[s]," and Armstrong worried that the "commotion" might mean trouble. J.A. 89–90, 92. Perhaps "a medical emergency." J.A. 91. Or perhaps "somebody was just upset that their car had broken down." J.A. 91. Either way, "[b]eing close to a military installation," he drove up to check on Wells. J.A. 91. When he reached Wells, Armstrong parked behind the Mustang. And as he did, he noticed that Wells's car bore an

---

[1] Normally, on appeal of a Rule 12(b)(6) dismissal, we consider only the facts alleged in the complaint. But Wells asks us to consider exhibits that he attached to his complaint as well, including police footage, and testimony and documents from the records of criminal proceedings against him. Below and here, the defendants agree that this is appropriate. With the parties in agreement, we will treat Wells's exhibits as adopted by the complaint. *See Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006); *see also Balogh v. Virginia*, 120 F.4th 127, 131 (4th Cir. 2024); *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013); *cf. Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024).

[2] Arlington Cemetery lies between Fort Myer and the Pentagon. Military police like Armstrong patrol the cemetery and its surroundings under a joint agreement with Arlington County police.

4

expired temporary registration. So he summoned Arlington County police and chatted with Wells while he waited for them to arrive.

### B.      Arlington Police Arrive, Detain Wells, and Search His Mustang

When the local law-enforcement officers turned up, one of them, Officer Javier Fuentes, learned from Armstrong that Wells's registration had expired. Fuentes also discovered that Wells wasn't carrying a driver's license. And when he asked Wells whether he had any guns in the car, Wells replied that he had an AR-15 in the trunk and a Glock in the center console. Finally, glancing into the car, Fuentes saw a ballistic plate carrier—a type of body armor—resting in plain view on the back seat. With that, Fuentes cuffed Wells and sat him on the curb while he sorted out what to do. Other local officers retrieved the weapons and ran their serial numbers.

By this point, the officers faced a complex problem. They already knew that Wells had committed at least two offenses: driving without a license and driving with an expired registration. *See* Va. Code §§ 46.2-104, 46.2-646. Without a license, Wells couldn't lawfully drive home. At the same time, his car couldn't remain parked in a public lot with an expired tag. *See* Arlington County, Va., Code § 14.2-2(A)(2) (2015).

Given all this, the local officers knew they needed to tow Wells's Mustang. Following Arlington County Police Department practice, the officers performed an inventory search of the car before towing it. That search turned up a formidable arsenal: five loaded AR-15 magazines, a drone, a laptop, rubber knives, face masks, radios, a Texas license plate, a smoke grenade, two tactical vests, a list of weapons to be purchased, a

5

"Stanley Fat Max 24-inch yellow crowbar," and a Ceradyne ballistic plate bearing serial number 2923205 inside the earlier-discovered plate carrier. J.A. 266–68.

This gear raised another problem. Normally, the police could have just sent Wells home. Though he couldn't drive, he could walk or call a cab, and he could ordinarily take with him whichever of his possessions he wanted from his car. But the guns, grenade, and plate carrier posed an issue. Arlington Cemetery is right next to the Pentagon, and the officers understandably didn't want to deck Wells out in weapons and tactical gear, then send him walking past one of the nation's most sensitive sites.[3] Instead, they recommended that he phone a friend to pick him up. But Wells couldn't find anyone to get him. So the local police suggested that Wells leave his gear with them. "Okay," he replied. J.A. II 01:06:10–01:06:30. Accordingly, the local police decided which items warranted separate safekeeping and which could remain in the trunk, then explained the property retrieval process to Wells. "Cool, cool," he said. J.A. II 01:12:18. After Wells signed the property retrieval form, the local police gave his Mustang to the tow company.

### C.    Arlington County Police Revisit Wells's Property in Custody

The next day, Arlington County's Detective Scott Wanek took another look at Wells's in-custody gear. The armor plate aroused Wanek's interest because it bore an Army serial number—and Wells, Wanek discovered, is a veteran of the Army's Third Infantry Regiment. Wells served with the Old Guard's Echo Company until 2019, when he received a General Under Honorable Conditions discharge. Seeing this, Wanek called

---

[3] Nor, apparently, could Wells summon a ride—because Ubers don't allow guns.

6

the military police and spoke to Detective Keith Shepherd. Shepherd told Wanek that Echo Company reported several armor plates as stolen about a month before Wells was discharged. So Wanek did some digging. He discovered that after Wells's gear return, "he was given a 'statement of no charges,' meaning that [he] had returned all issued equipment." J.A. 268. Yet somehow, a serialized Army plate turned up in the back of his car. And as far as Shepherd knew, there was no legitimate way Wells could have left the Army but kept the Army's plate.

### D.       Arlington County Police Arrest Wells, and Virginia Brings Criminal Charges

Wanek thus sought a warrant to arrest Wells. Three days after Wanek got the warrant, he called Wells and invited him to "pick up his gear" from the Arlington County courthouse. J.A. 295. But this was a ruse. When Wells arrived at the courthouse, this time driving a Pontiac, he was arrested. And when Wanek asked him about the plate, Wells confessed that he had stolen it from his Army roommate during out-processing. Meanwhile, Officer Ashley Barnickle impounded and requested a search warrant for the Pontiac because local police suspected Wells had more plates and intended to sell them. When the warrant arrived, Barnickle searched the Pontiac and found more tactical equipment, along with various unknown substances: a rifle magazine loaded with 28 green-tipped rounds; lock picks; a hemorrhage bandage; gauze; "spikes/darts with case"; a black bag containing various pills and white powder, and a notebook with Proverbs 3:5 on the cover ("Trust in the Lord with all your heart, And do not lean on your own understanding."). J.A. 284.

7

Later, in February 2020, Wells was convicted of the traffic offenses. In March, a grand jury indicted him for receiving stolen property valued in excess of $500, a violation of Va. Code § 18.2-108. Wells was denied bail because the state court considered him a "flight risk and a danger to the community." And in July, another grand jury indicted Wells on drug charges. In September, Virginia declined to prosecute the stolen-property case. Wells was then released from jail. And in April 2021, Virginia likewise declined to prosecute the drug case.

### E.    Wells Sues

With the criminal cases over, Wells brought state and federal claims against many state and federal officers, Arlington County, and the United States. He pleaded Fourth Amendment claims under 42 U.S.C. § 1983 against the state defendants for detaining him, searching his car, and seizing his property on February 9; searching his property again once it was in police custody; and lying to magistrates to secure the later arrest and search warrants. He likewise pleaded a Second Amendment claim against the state defendants for taking his guns. As for the federal defendants, he claimed Fourth and Fifth Amendment violations under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Last, he brought state tort claims against various individual officers for false imprisonment and malicious prosecution, a *Monell v. Dep't Soc. Servs.* claim against Arlington County, *see* 436 U.S. 658 (1978), and a direct claim against the United States, citing the Federal Tort Claims Act, *see* 28 U.S.C. § 1346 *et seq.*

8

### 1.     The United States Steps In

Because Wells sued two federal officers for state torts, the United States stepped in as a party, substituting itself for Armstrong and Shepherd under the Westfall Act, 28 U.S.C. § 2679(d)(1). Wells moved to strike the substitution, complaining (without evidence) that Armstrong and Shepherd had acted ultra vires and were therefore ineligible for the Westfall Act's protections. The district court denied Wells's motion. It reasoned that absent evidence to counter the U.S. Attorney's Westfall Act certification, that certification presumptively proved that Armstrong and Shepherd acted within the scope of their employment.

### 2.     The District Court Dismisses Wells's Claims

All defendants successfully moved to dismiss Wells's claims. The district court reasoned that qualified immunity protected the federal officers even if a *Bivens* remedy were available. So too for the state defendants. And because Wells never alleged that Arlington County's policies caused the harms he complained of, the district court also rejected *Monell* liability. Wells's state tort claims against state officers likewise failed because Wells didn't allege all their elements. As for the United States, the district court held that Armstrong and Shepherd performed discretionary functions, so Wells's claim against them was barred by sovereign immunity.

Wells now appeals.[4]

---

[4] We have jurisdiction to decide Wells's appeal under 28 U.S.C. § 1291. And we review *de novo* the dismissal of his claims—whether they were dismissed on the merits, *Evans v. United States*, 105 F.4th 606, 616 (4th Cir. 2024), or for lack of jurisdiction, *Doe* (Continued)

9

## II.    Discussion

State and federal officials alike "are immune from suit . . . unless they have violated a [federal] statutory or constitutional right that was clearly established at the time of the challenged conduct." *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (quotation omitted). Though qualified immunity is controversial, we are bound to apply it in full measure. And it is demanding.

Qualified-immunity cases involve two steps. At step one, the plaintiff pleads a § 1983 or *Bivens* action by showing that an official's conduct violated his right.[5] *See Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). At step two, qualified immunity allows the official to beat the plaintiff's claim by showing that the asserted right was less than "clearly established" at the time of the conduct. *Plumhoff v. Richard*, 572 U.S. 765, 778 (2014).[6] What does it mean for the asserted right to be "clearly established?" It must be

---

*v. Meron*, 929 F.3d 153, 163 (4th Cir. 2019). To avoid dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And to "nudg[e] the claims across the line from conceivable to plausible," the facts alleged must surpass "the speculative level." *Evans*, 105 F.4th at 616 (quoting *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020)).

[5] What this showing requires of the plaintiff depends on the stage of litigation. On a Rule 12(b)(6) motion, we ask whether the plaintiff has plausibly alleged all the elements his claim requires. At summary judgment, we ask whether there's a real, trial-worthy dispute about some fact that the claim turns upon. Either way, what is required at step one is essentially a normal merits analysis indexed to the relevant stage of litigation. *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

[6] Qualified immunity thus consists of two questions, on which the burden of proof is split in the Fourth Circuit. Has the plaintiff shown that his rights were violated, and has the officer shown that the asserted rights were less than clearly established? *Thurston v. Frye*, 99 F.4th 665, 673 (4th Cir. 2024).

the case that "any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 779. Of course, the "reasonable official"—like the "reasonable man" posited by some tort cases—is a fiction. Qualified immunity's real bite lies in what this hypothetical is supposed to measure: The law is not "clearly established," or obvious to "any reasonable official," unless "existing precedent" has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

It's easier to show that a right was *probably* violated than inarguably violated, and so "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Thus, to avoid "substantial expenditure of scarce judicial resources," we may take these two steps in either order—or, answering one in the negative, decline to answer the other. *Id.* at 236. If we choose to take the second, qualified-immunity inquiry first, we assume that the plaintiff has shown all the facts alleged. In other words, we assume that the plaintiff can carry his burden at step one. *See Stanton*, 25 F.4th at 233 & n.5. Then we ask whether *if* what he says were true, this would amount to an inarguable breach of law.

Because at step two the question must be beyond debate from the perspective of *any* reasonable officer, we often say that qualified immunity calls for an "objective" test. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815–17 (1982). The Supreme Court has explained "that bare allegations of malice should not suffice to subject" officers to the "burdens" of suit. *Id.* at 817–18. This means we do not ask at step two whether the defendant officials subjectively knew they broke the law, or even did so deliberately. *Id.* at 818–19. Instead,

11

we *assume* that the plaintiff can win at step one and then ask only whether what the officer allegedly did was undebatably wrong.[7]

Yet because the precise scope of "clearly established law" depends on "existing precedent," the factual details of past cases matter a great deal. *al-Kidd*, 563 U.S. at 741–42. The Supreme Court has "repeatedly" admonished that we should not "define clearly established law at a high level of generality." *Id.* at 742. Instead, to find a violation of clearly established law, we must be able to "'identify a case' or a 'body of relevant case law' where 'an officer acting under similar circumstances was held to have violated the Constitution.'" *Rambert v. City of Greenville*, 107 F.4th 388, 402 (4th Cir. 2024) (cleaned up) (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018)). If no prior case has announced a "rule" that "obviously resolve[s]" the rights claim at hand, then the right was not clearly established. *Wesby*, 583 U.S. at 64.[8]

---

[7] Some of our cases rightly observe that despite this rule, defendant officers' motivations really can matter at *step one*. In First Amendment retaliation cases, for example, or in Eighth Amendment deliberate-indifference cases, it's clearly established that whether an officer broke the law *depends* on his private, subjective motives—which means we can't answer the step-one question without knowing something about those real motives. *See Crawford-El v. Britton*, 523 U.S. 574, 588–89 (1998); *Thompson v. Virginia*, 878 F.3d 89, 106 (4th Cir. 2017). So although it's true that we never consider officers' true intentions at step two, we *do* still consider officials' subjective motivations at step one if those motivations are elements of a plaintiff's claim. But if we take step two first, we don't need to know—and therefore don't ask—whether the officers acted with malice. We assume that the plaintiff has made out his claim, including any element of subjective malice, and then ask whether it is clear beyond debate that the conduct pleaded broke the law.

[8] That "specificity is especially important" in Fourth Amendment cases, where it is "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal (Continued)

This objective, fact-bound standard is "demanding." *Id.* at 63. The "crucial question" is whether *every* reasonable officer would know *this* action in *this* situation was unlawful. *Plumhoff*, 572 U.S. at 779. If even one reasonable officer could think that "existing precedent" did not put the legality of the conduct at issue "beyond debate," then all officers are immune. *al-Kidd*, 563 U.S. at 741.

## A.    Wells's Fourth Amendment Claims Fail

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Wells alleges search and seizure alike. But the officers' alleged conduct did not run afoul of clearly established law. So qualified immunity shields the officers.

The Fourth Amendment, fundamentally, demands reasonable conduct. *See, e.g.*, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"). In explaining what is reasonable and what is not, the Supreme Court has identified certain types of conduct that often clear the reasonableness hurdle. The typical reasonable search or seizure happens within the boundaries of a valid warrant. *See Maryland v. Garrison*, 480 U.S. 79, 86 (1987). But without a warrant, searches and seizures may still be reasonable. For instance, warrantless searches are often reasonable when they accompany an arrest. *See, e.g.*, *Riley v. California*, 573 U.S. 373,

---

quotation marks omitted). The Supreme Court often reiterates this proposition. *See, e.g.*, *Wesby*, 583 U.S. at 64 ("[W]e have stressed the need to 'identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.'" (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017))). For this reason, cases like this one are not "'the rare obvious case,' where a general standard can clearly establish the answer." *Garrett v. Clarke*, 74 F.4th 579, 589 (4th Cir. 2023) (quoting *Wesby*, 583 U.S. at 64).

382 (2014). So too under exigent circumstances, when "there is compelling need for official action and no time to secure a warrant." *Mitchell v. Wisconsin*, 588 U.S. 840, 849 (2019).

Yet these categories are more heuristics than hard-edged rules. They have inherently fuzzy boundaries because classifying conduct requires circumstance-specific analysis. *See, e.g.*, *United States v. Banks*, 540 U.S. 31, 36 (2003) (explaining that the Court has "largely avoid[ed] categories and protocols for searches" because "it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance"). And these guidelines don't exhaust the universe of reasonable actions. The categories can help, but "reasonableness [is] a function of the facts of cases," and seldom does one fact have "dispositive[] significance." *Id.* For this reason, we must decide in every individual case whether officers acted reasonably.

"[A]most without exception," whether police action satisfies this reasonableness command turns on "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 137 (1978). We thus generally do not consider officers' subjective intentions. *Brigham City*, 547 U.S. at 405; *Whren v. United States*, 517 U.S. 806, 813–14 (1996). Instead, we consider only what an imaginary, reasonable officer could have done in the same situation with the same knowledge. And whether a particular action falls within the reasonableness window or without depends on whether "the circumstances, viewed objectively, justify the action." *Brigham City*, 547 U.S. at 404 (cleaned up).

14

As laid out above, in qualified-immunity cases, we layer a second objective inquiry atop the first. At the first layer (the Fourth Amendment one), we ask whether a reasonable officer could have done the challenged act—that is, whether his conduct was factually reasonable. This determines whether officers violated a constitutional right. And at the second layer (the qualified-immunity one), we ask whether the conduct was "*legally* []reasonable"—that is, whether any officer could have thought the act factually reasonable and thus lawful under the Fourth Amendment. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (emphasis added). This determines whether the asserted right was clearly established. All together, step-two asks in Fourth Amendment cases whether every reasonable officer would know that the challenged conduct was *un*-reasonable.[9]

### 1. Officers Lawfully Approached Wells

First, Wells claims that Armstrong seized him simply by pulling up behind him and blocking him in. An officer merely approaching a person does not implicate the Fourth Amendment. Police can always talk to people in public—just as "any private citizen might do without fear of liability." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (internal quotation marks omitted) (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). The Fourth

---

[9] As explained, qualified immunity does not foreclose inquiry into officers' subjective motivations when those motivations form an element of the plaintiff's claim. But Fourth Amendment claims do not invite this subjective analysis. *See Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009). In a few limited contexts, like inventory searches, we may examine "programmatic" purposes—that is, the reasons for the general policy for inventory searches. *Id.* But that is not the same as considering *individual* officers' subjective motives. When it comes to individual officers, we consider only whether their conduct was objectively reasonable, not what went through their minds as they did it.

Amendment is implicated only if police do more, like prevent someone from leaving. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). We assume without deciding that Armstrong did more and thereby seized Wells. Given this, our question is whether Wells had a clearly established right against seizure in this situation.

Armstrong asserts that a reasonable officer could think pulling up behind Wells was lawful under a doctrine sometimes called the "community-caretaking exception." This doctrine emerged, almost by accident, out of passing comments in two decades-old Supreme Court opinions. *See* Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* § 10.3 (2017). In the first, *Cady v. Dombrowski*, the Court observed that police are not just crime-fighters. 413 U.S. 433 (1973). They also regularly "engage in what, for want of a better term, may be described as community-caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. In *Cady*, the Court used that principle to explain a search that began as an effort to check a driver's welfare but wound up uncovering evidence. Then, in *South Dakota v. Opperman*, the Court applied the principle to towing disabled or illegally parked vehicles: "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." 428 U.S. 364, 369 (1976). From there, the principle assumed a life of its own. And today, the principle has become a doctrine, "broadly utilized" by federal and state courts alike to cover the vast range of situations in which police engage in activity unrelated to law enforcement yet uncover evidence of crime. Clancy, *supra*, § 10.3; *see also*

16

*Pennsylvania v. Livingstone*, 174 A.3d 609, 625–27 (Pa. 2017) (thoughtfully detailing the range of state-court treatment of the community-caretaking exception).

Perhaps because the doctrine is so capacious, its boundaries remain hazy, for "many police tasks . . . go beyond criminal law enforcement." *Caniglia*, 593 U.S. at 200 (Alito, J., concurring). Even when limited to the highway, noncriminal police action can take many forms depending on "the recurring practical situations that result[] from the operation of motor vehicles . . . with which local police officers must deal every day." *Cady*, 413 U.S. at 446. But the idea that police may respond to car accidents without risking civil liability does not hand them a blank check in all other situations. For instance, the Court recently clarified that the community-caretaking exception is not "a *standalone* doctrine that justifies warrantless searches and seizures *in the home*." *Caniglia*, 593 U.S. at 196 (emphasis added). Helpful as this guidance is, the doctrine's limits elsewhere remain unsettled.

We need not decide the exception's precise bounds—or even decide whether it definitively applies here—to conclude that Armstrong violated no clearly established right. Though the exception is fuzzy around the edges, its core claim is that police can reasonably "provid[e] aid to motorists." *Caniglia*, 593 U.S. at 199. And they can reasonably help someone in need more generally. Armstrong saw a car parked outside the cemetery, and he did "not know[]" "if it was a medical emergency," or the "car had broken down," or its

17

occupant was "upset in some way." J.A. 91.[10]  A reasonable officer in such circumstances

may well have thought caretaking justified.  *See Brigham City*, 547 U.S. at 404.  At the

very least, we cannot "identify a case" that has held the caretaker exception inapplicable to

an analogous situation, so we cannot say that the constitutional question is "beyond

debate."  *Wesby*, 583 U.S. at 64 (quotations omitted).  Nor will we speculate whether

Armstrong secretly harbored other, more nefarious motives.  Under our precedents, an

officer's private beliefs make no constitutional difference in this context.  *See Hunsberger*,

570 F.3d at 554.  Wells recognizes that the caretaking exception has nebulous borders.  But

---

[10] Though this appeal comes to us on a motion to dismiss, the parties and district court relied on Armstrong's testimony below.  Wells quoted long excerpts from it in his complaint.  The federal defendants attached a longer portion as an exhibit to their motion to dismiss.  And the district court's discussion of the caretaking issue depended on those submissions.

Now, Wells backpedals—insisting that we should defer to the language in his complaint over the testimony he pasted into it.  But although "it is not always appropriate to conclude that the plaintiff has adopted" whatever is in his complaint, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016), it is too late for Wells to make this argument now.  Wells's reliance on the testimony below created a "presumption" that he "adopted [it] as true." *Id.* at 167.  Any objection to this was forfeited by his failure to make it below.  The argument is forfeited here too, notwithstanding Wells's misgivings, because he does not argue that we shouldn't consider Armstrong's testimony for its truthfulness. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (explaining that a party cannot preserve an argument on appeal just by "tak[ing] a passing shot at the issue" (quotation omitted)).

And given that the testimony was incorporated into Wells's complaint, its content trumps Wells's denials.  Even on a motion to dismiss, "in the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails." *Goines*, 822 F.3d at 166 (cleaned up).  So Armstrong's testimony about what he saw overcomes Wells's bare denial.

18

that means Wells cannot claim a clearly established right—ambiguity is a shield, for better or for worse.[11]

## 2.    Then, Officers Lawfully Inventoried Wells's Mustang

After Officer Armstrong told the local police that Wells carried an expired tag, they could remove Wells from the car to investigate.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).  And as Wells concedes, they could detain him and remove the guns from his car while they did so.

Wells argues that even though police could lawfully do all that, they couldn't constitutionally search the rest of his car just because they meant to tow it.  But here too, the officers take shelter within a Fourth Amendment exception.  They reply that they weren't "rummaging" for "incriminating evidence" but conducting a routine administrative inventory search.  *Florida v. Wells*, 495 U.S. 1, 4 (1990).  We agree.  It's reasonable for a police department to require an inventory before towing a car.  This protects police and civilians alike from dangerous items and lost property.  *See United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007).

Of course, an inventory search must be conducted in good faith.  *Id.*  Under our precedents, this means two things.  First, the policy or practice authorizing the search must not have an impermissible "programmatic purpose."  *Hunsberger*, 570 F.3d at 554; *see*

---

[11] Wells also objects that police continued Armstrong's unlawful seizure when they arrived.  But this fails for the same reason as his first claim.  When local police arrived, they could rely on Armstrong's seizure (if it was a seizure).  We do not have a clearly established anti-piggybacking rule.  *See United States v. Hensley*, 469 U.S. 221, 231–32 (1985).

*also Wells*, 495 U.S. at 4 ("The policy or practice governing inventory searches should be designed to produce an inventory."). Second, officers' searches must "generally" accord with such "standard procedures." *Banks*, 482 F.3d at 739–40; *Colorado v. Bertine*, 479 U.S. 367, 374 (1987) ("[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment.").[12] Searches that satisfy these two requirements clear the First Amendment's reasonableness hurdle.

The local officers' search did. Wells had valuable gear in the car, equipment that could have been the basis for costly claims if the police lost or damaged it. *See Bertine*, 479 U.S. at 372–73. The gear was dangerous too. *See id.* And so the officers explained that they followed department policy, which instructed them to inventory vehicles before having them towed. By following the policy's mandates, the police searched "according to standardized criteria." *Id.* at 374 n.6. And Wells alleges nothing to the contrary.[13]

Wells's responses are unconvincing. First, he claims that an inventory search could withstand the Fourth Amendment only if officers removed *everything* from the car. But we have never required that. *See, e.g.*, *Bertine*, 479 U.S. at 369 (upholding an inventory

---

[12] With respect to individual officers, this good-faith requirement is thus an objective one. *Cf. United States v. Leon*, 468 U.S. 897, 919–20 & n.20 (1984) (explaining the similar, "objective good faith" exception to the exclusionary rule).

[13] Wells makes no headway by arguing that the local police should have given him an impound form earlier than they did—or that officers otherwise breached policy in some unspecified way. As we have explained, inventory searches should generally follow department policy. But not every "t" need be crossed. *See Banks*, 482 F.3d at 739–40 (upholding an inventory search despite six discrepancies, including an improper inventory form, between the policy and the officer's actions). Wells fails to allege any substantial departure from policy and thus cannot show bad faith.

search that was "performed in a 'somewhat slipshod manner'"). And for good reason: The point of inventory searches is identifying dangerous or valuable property. *See United States v. Horsley*, 105 F.4th 193, 215–16 (4th Cir. 2024). Combing through every tiny compartment and seizing every item would go far further than required to achieve that end and would intrude on motorists' privacy more than necessary.

Wells next objects that police should not have opened containers within his car. But this too is mistaken. "[A]n inventory-search policy may leave the inspecting officer 'sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself.'" *Banks*, 482 F.3d at 739 (quotation omitted). And Wells does not even try to explain which containers he thinks were wrongly opened or why the circumstances didn't justify opening them.

Last, Wells insists that the local police jumped the gun by beginning the search before they knew his car needed to be towed. As he tells the story, police only realized they needed to tow his car once they discovered valuables inside—items that couldn't be left on the side of the road and that Wells couldn't take with him. But the decision about what to do with Wells's property and the decision to tow his car are logically independent. A car with an expired registration cannot lawfully occupy a public thoroughfare in Arlington. Arlington County, Va., Code § 14.2-2(A)(2) (2015). So, because Wells could not legally drive the car away, the officers had to tow the car upon learning that Wells's registration was expired. Wells may be right that local police couldn't know which of his things they would take for safekeeping until he confirmed that no one would pick him up.

21

But they did know, long before Wells gave up trying to phone a friend, that his Mustang needed to be towed. And that triggered a constitutional inventory search.[14]

### 3. With Wells's Consent, Local Police Lawfully Safekept Wells's Property

Wells also argues that the local police unlawfully took his property for safekeeping. Many of his claims turn on this assertion, but they all fail because it is false: Wells consented to the safekeeping. When officers realized that Wells had weapons, tactical gear, and other valuable items in the car, they explained that he could not leave them by the roadside. And though they did not forbid him to walk home with his kit, they did advise him that it would be unwise to strap on a plate carrier and then stroll past the Pentagon with a rifle slung from his shoulder. Wells prudently took that advice.

Wells now backtracks and claims that although he signed the police property retrieval form, he did not *really* consent. The video of his interaction with the police belies this bare assertion. He accepted, on video, that leaving his things with the police was his best option. Though he—and the police—might have preferred to find someone to take him home, it was Wells who voluntarily abandoned that endeavor. When he did, Wells agreed to leave his things without protest. The video is clear that Wells cheerfully accepted the officers' offer. His claims of coercion therefore fail.[15]

---

[14] Wells's claim that officers detained him for too long also fails. Police could lawfully detain Wells long enough to perform this search. *See Muehler v. Mena*, 544 U.S. 93, 100 (2005).

[15] Wells replies, citing *Miranda v. Arizona*, 384 U.S. 436 (1966), that consent must be clearer than this. How clear, he does not say. But his reliance on *Miranda* is misplaced. (Continued)

22

For this reason, the district court rightly dismissed Wells's consent-to-safekeeping arguments. At the motion-to-dismiss stage, "in the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails." *Goines*, 822 F.3d at 166 (cleaned up). We have applied the attached-exhibit rule to videos as well as documents. *Doriety*, 109 F.4th at 679. So if a plaintiff bases his complaint on a video, yet the video "'blatantly contradicts' [his] allegations," then we will dismiss those allegations as "implausible." *Id.* at 680 (citation omitted).

### 4. Later, Officers Lawfully Revisited Wells's Property

Wells next alleges that Detective Wanek unreasonably searched his gear the day after police took it for safekeeping. And because this second look prompted Wanek to investigate whether Wells had stolen the Army's ballistic plate, he complains that this tainted his later prosecution for the theft. But this just repackages Wells's other arguments. As Wells concedes, "evidence otherwise taken lawfully, can be later reviewed without Fourth Amendment violation." Opening Br. 38. So the only claim he makes on appeal is that police wrongly seized his property to begin with and that this wrongful seizure infected

---

*Miranda* does not demand clear consent to questioning. The *Miranda* cases teach nearly the opposite: A suspect must speak "unambiguously" to *invoke* the rights to remain silent and to counsel. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). And in any event, we have held that a consent to search does not require magic words—or, for that matter, any words at all. *See United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (finding consent in a "shrug[]"). So Wells's repeated statements here suffice.

everything that happened later. Yet as explained, there was no wrongful seizure; Wells voluntarily put the property in police custody. So this claim also fails.[16]

## B.    Wells's Second Amendment Claims Fail

Alongside his Fourth Amendment claims, Wells also alleges that officers violated his Second Amendment rights by taking his guns. But this claim runs into the same qualified-immunity problem. It may—*may*—be true that the officers' acts might violate the Second Amendment if they repeated them today. But qualified immunity demands we look at the law's content "*at the time* of the conduct in question." *Mays*, 992 F.3d at 301.

---

[16] Atop the claims already discussed, Wells argues that officers violated his rights by lying to a magistrate. Wanek, he says, lied about the ballistic plate—what it was worth and whether he had reason to think it stolen—to get an arrest warrant. In his view, this constitutes both a Fourth and a Fifth Amendment violation. But given what we have explained, there was no lie. After Wanek's investigation, local police had probable cause to believe Wells stole the plate. Shepherd told Wanek that there was no legitimate way Wells could have left the Army but kept its equipment. Rather than refute this, Wells appears to suggest that police can only seek a warrant if they not only suspect a crime but also know precisely *how* the crime was committed. But we have never required that. We have instead repeatedly stated that an arrest warrant may be issued so long as "facts and circumstances within the officer's knowledge" are sufficient for a person of "reasonable caution" to think that "the suspect has committed . . . an offense." *Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017) (quoting *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015)).

Wells also quibbles that the police had reason to doubt the plate was worth enough to support a felony charge. But this too gets him nowhere. Even if the plate wasn't worth much, its theft still would have been a misdemeanor. Va. Code § 18.2-96. Receiving it if it was stolen would have been a misdemeanor too. Va. Code § 18.2-108. And with probable cause to think Wells committed a misdemeanor, officers could seek a warrant for his arrest. *See Thurston*, 99 F.4th at 674 n.4 ("Probable cause need not be tailored to the offense the arresting official suspected at the time of arrest.").

Wells additionally claims that after his arrest, local police again moved too soon by searching the car he arrived in before getting a warrant. But he provides no support for this bare allegation. Even on a motion to dismiss, we will not credit pure speculation. *See, e.g.*, *Evans*, 105 F.4th at 616.

24

In 2020, existing precedent had not established that the Second Amendment protects a right to public carry. *See Kolbe v. Hogan*, 849 F.3d 114, 135–37 (4th Cir. 2017) (en banc). That recognition came from the Supreme Court years later. *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8 (2022). Because Wells did not have a clearly established right in 2020, the police are entitled to qualified immunity.

*                    *                    *

Without alleging injury from the violation of a clearly established right, Wells has no federal claim against any of the individual officers.[17] Nor does he have a claim against Arlington County. Even supposing Wells pleaded injury to a constitutional right, he does not explain how any County policy, omission, or practice caused the harm. So no liability can attach to the County. *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).[18]

---

[17] For the federal officers, we have another reason to pause before allowing Wells's claim to proceed. Litigants alleging constitutional violations have a ready avenue to sue *state* officers for damages. That is the principal function of § 1983. But as to federal officers, plaintiffs have fewer options. No statute opens the door to § 1983-style damages actions against federal officers. And though the Supreme Court has cracked that door in a handful of situations, *see Bivens*, 403 U.S. 388; *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980), it has instructed inferior courts to reject opening the door further if we spot "even a single reason to pause." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (internal quotation marks omitted). But we need not decide whether to extend the "disfavored" *Bivens* action, *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (citation omitted), to Wells's claims. Because the federal officers are immune, we may affirm without reaching the *Bivens* question. *See Wood v. Moss*, 572 U.S. 744, 757 (2014).

[18] Rather than plausibly allege that County policy caused what happened to him, Wells instead postulates two patterns that—even if true—have little to do with his case. First, he says, Arlington County has a "historical practice of harassing law-abiding gun owners." J.A. 61. But he does not explain how this "historical practice" affected the police's decision to cite him for a traffic offense before they discovered his guns and later safekeep the guns with his permission. Second, he insists, Arlington County officers (Continued)

## C.    Wells's State Claims Likewise Fail

Besides his federal claims, Wells also argues that the officers's conduct violated rights against search and seizure that are conferred by Virginia law.  He is mistaken.  Virginia courts treat the state law he invokes as coterminous with federal constitutional protections.  *Cromartie v. Billings*, 837 S.E.2d 247, 254 (Va. 2020).  So these claims fare no better than their federal counterparts.[19]

Wells also presses state tort claims for false imprisonment and malicious prosecution against individual police officers.  But these claims fail too.  False imprisonment requires, among other things, an unlawful arrest.  But Wells doesn't dispute that he was arrested on a warrant.  And though he urges that the warrant relied on faulty premises, that is not enough to show an unlawful arrest in Virginia.  So long as the warrant was "regular and valid," false imprisonment does not lie absent some other issue with the detention.  *Lewis v. Kei*, 708 S.E.2d 884, 891 (Va. 2011) (quotation omitted).

---

disproportionately "arrest[] armed persons of color."  J.A. 62.  This fares no better.  The local police didn't arrest Wells when he was armed on February 9.  And when they *did* arrest him eight days later, it wasn't because he carried guns; it was because they thought he stole military equipment.

[19] To be sure, Virginia unlawful-search rules don't use the federal qualified-immunity standard.  But Virginia law gets to the same outcome by a different path.  Virginia state law accounts for sovereign immunity, which protects officers from liability unless they lack "even scant care" or else act "in conscious disregard of another's rights, or with reckless indifference to the consequences."  *Cromartie*, 837 S.E.2d at 254.  In other words, a merely negligent officer faces no liability under Virginia's unlawful-search rule.  *Id.*  And Virginia courts distinguish negligence from recklessness by a familiar standard: They ask whether a "search was performed contrary to well-established law."  *Id.* at 255.  For that, in turn, Virginia courts look to federal precedent.  *See id.*  So without a clearly established Fourth Amendment violation, Wells has no state-law claim either.

Malicious prosecution likewise requires more elements than Wells alleges. For one thing, it requires the government to prosecute without probable cause. *Dill v. Kroger*, 860 S.E.2d 372, 378 (Va. 2021). Wells says Virginia lacked probable cause to prosecute him for the stolen plate because police knew the plate was worth less than $500. But though the punishment is *harsher* if the stolen property is worth more than $500, stealing something worth less than $500 is still a crime in Virginia. Va. Code § 18.2-95, -96. And though Wells alleges that both prosecutions were baseless, his concessions upend that argument. Wells doesn't dispute that drugs were in his Pontiac or that an Army plate was in his Mustang. So this tort claim fails too.[20]

---

[20] Wells pursues the same state tort theories against Armstrong and Shepherd. For those claims, the United States stepped in to defend on Armstrong and Shepherd's behalf. *See* 28 U.S.C. § 2679(c), -(d)(1). But the United States has sovereign immunity. And though it has waived parts of that immunity, it hasn't waived with respect to federal employees' discretionary functions. *Id.* § 2680(a). If that sovereign immunity applies, district courts lack jurisdiction to consider the merits. *Fed. Deposit Ins. v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) (explaining that a court "act[s] ultra vires" if it considers the merits when "jurisdiction is in doubt"). And here, whether immunity applied turned on the scope of the discretionary-function exception. Concluding that the officers performed discretionary functions, the district court dismissed Wells's claim on Rule 12(b)(1), not 12(b)(6).

Yet we need not decide whether Armstrong and Shepherd carried out discretionary functions. The district court lacked jurisdiction for the second reason that, even if we accept Wells's allegations as true, neither Armstrong nor Shepherd committed any state torts. For "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *Brownback v. King*, 592 U.S. 209, 217 (2021) (citation omitted). Put differently, "a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim." *Id.* at 217–18. This, in turn, "means a plaintiff must plausibly allege that 'the United States, if a private person, would be liable . . .' under state law." *Id.* (quoting 28 U.S.C. § 1346(b)(1)). Wells does not. As explained, he does not plausibly allege that anyone committed any state torts. He thus "fails to plausibly allege an element (Continued)

27

\*          \*          \*

Few parking tickets become federal cases.  This one was unlucky for Wells because of the arsenal he carried in his car.  But with the car where it was, police had to tow it.  Needing to tow it, they had to inventory it too.  And wisely or not, Wells chose to leave its contents with the police.  Though what ensued proved inconvenient for Wells, it was not unconstitutional.  So the dismissal of all his claims is

*AFFIRMED.*

---

that is both a merit element of [his] claim and a jurisdictional element." *Id.* at 218 n.8.  So the district court could "dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6).  Or both." *Id.*

28